**FILED**

DEC 16 2022 JB

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION

22cv7105
Judge Chang
Magistrate Judge Cox
Randomly Assigned
CAT 2

| | |
|---|---|
| Alexander Kumpin -Administrator of Danua Kumpin, Deceased | ) ) ) |
| Plaintiff | ) **CASE NUMBER** ) |
| *v.* | ) |
| *GENERATIONS AT REGENCY and its* *unknown owner or owners* | ) ) **PLAINTIFF DEMANDS TRIAL** ) **BY JURY** |
| | ) |
| REGENCY NURSING PROPERTY, LLC | ) |
| SWEDISH COVENANT HEALTH | ) ) |
| THE METHODIST MEDICAL CENTER FOUNDATION UNITY POINT TRINITY HOSPITAL *and its* *unknown owner or owners* D/B/A - UNITY POINT HEALTH – CENTRAL ILLINOIS FOUNDATION AND UNITYPOINT HEALTH METHODIST /PROCTOR FOUNDATION DOES 1-20, ROE CORPORATIONS A- Z, inclusive | ) ) ) ) ) ) ) ) |
| Defendants | ) |

## VERIFIED COMPLAINT

1.  Danuta Kumpin died of a cruel and unnecessary death on December 17, 2020. Due to the

    grossly substandard medical care that she received while she was a patient at

    GENERATIONS AT REGENCY and its unknown owner or owners, REGENCY

    NURSING PROPERTY, LLC, SWEDISH COVENANT HEALTH, THE METHODIST

    MEDICAL CENTER FOUNDATION- D/B/A - UNITY POINT HEALTH - CENTRAL

ILLINOIS - FOUNDATION AND UNITYPOINT HEALTH METHODIST/PROCTOR FOUNDATION.

2. As a direct and proximate cause of the different and untimely care Danuta Kumpin received, the Plaintiff Alexander Kumpin the Administrator/Representative Alexander Kumpin brings this lawsuit for monetary damages caused by Danuta Kumpin's wrongful death.

3. Each of the Defendants, including REGENCY NURSING PROPERTY, LLC, own and operates the nursing home facility contributed to cause the untimely suffering and death of Donut Kumpin.

4. Plaintiff Alexander Kumpin is the duly appointed and authorized Administrator/ Representative.

<b><u>JURISDICTION</u></b>

5. Jurisdiction is proper in this Court pursuant to the EMTALA, specifically 42 U.S.C. § 1395dd(d)(2)(A).

6. Jurisdiction is proper in the Court pursuant to 28 U.S.C. § 1331, as this instant action requires the interpretation and application of a federal statute.

7. The amount in controversy, exclusive of interest and costs, exceeds SEVENTY- FIVE THOUSAND DOLLARS ($75,000.00). Jurisdiction in this judicial district therefore exists under 28 U.S.C. § 1332.

8. This Court has supplemental jurisdiction under 28 J.S.C 1367§ over Plaintiff's state law claims.

## VENUE

9.  Venue is proper in the United States District Court for the Northern District of Illinois
    under 28 U.S.C. § 1391(b)(2) in that the Defendants and Plaintiffs are located within and a
    substantial part of the acts or omissions complained of occurred within the District.

## PARTIES

10. The Plaintiff, Alexander Kumpin is an adult citizen of Illinois who resides in the state of
    Illinois, County of Cook.

11. At all revenant times and in violation of law REGENCY NURSING PROPERTY, LLC f/
    k/a/ REGENCY NURSING CENTRE, INC, d/b/a, 6631 N. MILWAUKEE, LLC, d/b/a
    6840 N. LINCOLN AVE used the name unregistered name of **GENERATIONS AT
    REGENCY and/or GENERATIONS AT REGENCY REHABILITATION &
    SKILLED NURINGS** on its buildings, on it's health care records and vehicles.

12. Defendant REGENCY NURSING PROPERTY, LLC, (herein after called "Regency ") is a
    limited liability company doing business in Illinois with its headquarters and principal
    place of business  is 6840 North LINCOLN Avenue, LINCOLNWOOD, Illinois 60712.

13. REGENCY NURSING PROPERTY, LLC owns and operates the facility located at 6631
    North Milwaukee Avenue, Niles Illinois.   REGENCY NURSING PROPERTY, LLC
    owned and operated the facility on or about August 25, 2020 at the time the deceased
    Danua Kumpin was injured.

14. Defendant, SWEDISH COVENANT HEALTH (herein after called "Swedish") is a Not-For-Profits corporations doing business in the state of Illinois. The Agent is listed as ANTHONY GUACCIO, 5145 NORTH CALIFORNIA AVENUE CHICAGO, IIllinois 60625.

15. Defendant, THE METHODIST MEDICAL CENTER FOUNDATION- D/B/A - UNITY POINT HEALTH - CENTRAL ILLINOIS and UNITYPOINT HEALTH METHODIST/ PROCTOR FOUNDATION are Not-For-Profits corporations doing business in the state of Illinois (herein after called "Methodist Medical"). The Agent is listed as KEITH E. KNEPP, with an address of 221 N E Glen Oak, Peoria, Illinois 61636.

## FACTUAL BASIS OF CLAIM

16. On or about June 2, 2020, Danua Kumpin, the deceased was admitted to Unity Point Health - Trinity Hospital, herein after called ("Unity Point.") On or about June 6, 2020 when she was released she arrived at the Plaintiff's home with a medical identification wristband that contain the information of another individual.

17. On or about June 17, 2020 Danua Kumpin was taken to her primary physician, Dr. Zofia Stevanovic, MD. Dr. Stevanovic informed Danua Kumpin that she needed to go back to the hospital immediately to complete her medical treatment.

18. On or about June 17, 2020 Danua Kumpin was admitted to Swedish Covenant Hospital. She remained there until or about July 03, 2020. During the time that she was admitted to the hospital, (i) she was unable to speak for a week, (ii) She tested positive for Meningitis, Sepsis and developed extremely bad bed sores.

19. On or about July 3, 2020 at approximately 10:00 PM Danua Kumpin was transported by an ambulance to the Plaintiff's home.

20. On or about July 4, 2020 was taken by ambulance to Resurrection hospital due to her vegetative-like state. She was unable to speak. She received two blood transfusions.

21. Her medical records stated that she received a toxic amount of medications that damaged her brain.

22. According to the National Institutes of Health, drugs that are used to treat dementia.[2]

See https://www.nih.gov/news-events/nih-research-matters/drug-prescriptions-older-adults-dementia April 6, 20.

23. An analysis found that almost 14% of older adults with dementia had long-term prescriptions for three or more medications that affect the nervous system. Such drug combinations can raise the risk of dangerous side effects, and in some cases hasten cognitive decline.

24. The hallmark of dementia is loss of memory and other cognitive abilities. People with the condition can also experience depression, delusions, agitation, and other symptoms. These mental states can cause distress both to the people with dementia and their loved ones and caretakers.

25. Drugs to treat these symptoms are widely prescribed in people with dementia. However, few studies have shown a substantial benefit in this population. And these drugs all have effects on the brain and nervous system. The use of several such drugs at the same time, called polypharmacy, increases the risk of dangerous side effects. These range from an increased risk of falls to heart problems and even death.

26. Guidelines from professional societies advise against prescribing multiple drugs that affect the nervous system to older adults.

27. To look more closely at these prescribing practices, researchers led by Dr. Donovan Maust from the University of Michigan examined Medicare claims data from 2018 for more than a million older adults with dementia. The team analyzed prescriptions for antidepressants, antipsychotics, antiepileptics, benzodiazepines, certain sleep aids, and opioids.

Polypharmacy was defined as having prescriptions for three or more drugs for more than 30 consecutive days.

28. The study was funded by NIH's National Institute on Aging (NIA). Results were published on March 9, 2021, in *JAMA*.

29. About 14% of the older adults in the study had prescriptions for three or more drugs that affect the nervous system for longer than a month. Nearly three-quarters received at least one such prescription.

30. Among those prescribed three or more of these drugs, almost 60% had the prescriptions for more than half a year. About 7% had the prescriptions for the full year studied.

31. On or about July 9, 2020 was involuntarily admitted to Generation at Regency and its unknown owner or owners, located at 6631 Milwaukee Avenue, Niles Illinois 60714.

32. Upon the Danua Kumpin's involuntarily admission a care plan was developed by Generation at Regency and its unknown owner or owners. The care plant reflects that Danua Kumpin required the assistance of a two person extensive assistance during the transfer for a resident/patient with Lift sided Hemipegia and hemiparesis. (ii) that Gail belts are required to be used during transfer of a patient. Danua Kumpin was deemed a fall risk as stated verbatim as follows: *"She is a fall risk because she has a behavior of getting up for bed."* See paragraph 3, page 3 of 8 of EXHIBIT A as attached herein.

**COUNT ONE – Violation of 805 ILCS 405/2; (805 ILCS 405/3b); 805 ILCS 405/5) (from Ch. 96, par. 8) and 805 ILCS 405/6) (from Ch. 96, par. 8a)**

## AGAINST DEFENDANTS:

### GENERATIONS AT REGENCY and its unknown owner or owners, POINT TRINITY HOSPITAL its unknown owner or owners and the ROE Defendants

33. Plaintiff incorporates herein the allegations contained in Paragraphs 1 through 24 above as if

re-sated herein.

34. 805 ILCS 405 of the Illinois Compiled Statues states in pertinent parts as follows:

"805 ILCS 405/2) (from Ch. 96, par. 5)

Sec. 2. Persons conducting such business or any business under an assumed name who have prior to August 16, 1963 changed their names or whose names are additions to a business organization conducting business under an assumed name, for which a certificate has previously been filed, shall file another certificate setting out the change in their names or that their names

are additions to a business already in operation and every address where such business is conducted or transacted in the county within 30 days after August 16, 1963.

(805 ILCS 405/3b)

Sec. 3b. Locale misrepresentation.

(a) A person shall not advertise or cause to be listed in a telephone directory an assumed or fictitious business name that intentionally misrepresents where the business is actually located or operating or falsely states that the business is located or operating in the area covered by the telephone directory. This subsection (a) does not apply to a telephone service provider or to the publisher or distributor of a telephone service directory, unless the conduct prescribed in this subsection (a) is on behalf of that telephone service provider or that publisher or distributor.

(805 ILCS 405/5) (from Ch. 96, par. 8)

Sec. 5. Any person or persons carrying on, conducting or transacting business as aforesaid, who shall fail to comply with the provisions of this Act, shall be guilty of a Class C misdemeanor, and each day any person or persons conducts business in violation of this Act shall be deemed a separate offense.

805 ILCS 405/6) (from Ch. 96, par. 8a)

Sec. 6. If a person or persons required to register hereunder do not do so and such persons, or any of them, are unknown, civil actions may be brought against such person or persons, by filing suit against the business under its assumed name, naming all known owners, and designating as "unknown owner or owners" the other person or persons transacting business under such assumed name. A judgment rendered pursuant to this section shall be a personal judgment against all named owners and shall, in addition, be immediately enforceable against the property of the business and constitute a lien upon real estate held in the name of the business. At any time prior to satisfaction of judgment, if any, if the identity of a previously unknown owner is discovered, such person shall be named as a party defendant by motion to the court in which such case is pending or in which the judgment was entered, supported by an affidavit showing that notice of such motion has been given in the manner required for service of process upon an individual defendant by the Civil Practice Law, as heretofore or hereafter amended. Within 10 days after service of such notice, the previously unknown owner may appear and defend as in other civil cases; however, such defense shall not affect any judgment against any other person previously entered in the suit. If the defendant does not file an appearance within such 10 day period or if after hearing the defendant is found to be liable, the judgment, if any, theretofore entered in such suit shall be amended to include such person and shall at such time become a personal judgment against such person as if he had been individually named in the original complaint.

(Source: P.A. 82-783.)"

35. At all revenant times and in violation of the above mention sections of the Illinois Complied Statues. REGENCY NURSING PROPERTY, LLC f/k/a/ REGENCY NURSING CENTRE, INC, d/b/a, 6631 N. MILWAUKEE, LLC, d/b/a 6840 N. LINCOLN AVE used the name

unregistered name of **GENERATIONS AT REGENCY and/or GENERATIONS AT REGENCY REHABILITATION & SKILLED NURSING** on its buildings, on it's health care records and vehicles as shown below:

# EXHIBIT A







36. The Illinois Secretary of State keeps a record of all businesses that conduct business in the state of Illinois. This holds true whether is business is in active status or has been dissolved. A search of the first word "**Generations**" shows that no company named "Generations at Regency" as ever been registered with the Illinois Secretary of State. As shown below:



## COUNT TWO: EMTALA VIOLATION FOR FAILURE TO SCREEN Danua Kumpin
### (Against Defendant Unity Point and Swedish)

37. Plaintiffs re-allege and incorporate the preceding paragraphs of this Complaint as if they

were fully set forth herein.

38. EMTALA, specifically 42 U.S.C. §1395dd(a) states:

In the case of a hospital that has a hospital emergency department, if any individual
(whether or not eligible for benefits under this subchapter) comes to the emergency
department and a request is made on the individual's behalf for examination or treatment
for a medical condition, the hospital must provide for an appropriate medical screening
examination within the capability of the hospital's emergency department, including
ancillary services routinely available to the emergency department, to determine whether
or not an emergency medical condition (within the meaning of subsection (e)(1) of this
section) exists.

39. EMTALA, specifically 42 U.S.C. §1395dd(b) states:
    (b) Necessary stabilizing treatment for emergency medical conditions and labor
    (1) In general. If any individual (whether or not eligible for benefits under this subchapter)
    comes to a hospital and the hospital determines that the individual has an emergency
    medical condition, the hospital must provide either—
    (A) within the staff and facilities available at the hospital, for such further medical
    examination and such treatment as may be required to stabilize the medical condition, or
    (B) for transfer of the individual to another medical facility in accordance with subsection
    (c) of this section.

40. EMTALA, specifically 42 U.S.C. §1395dd(b), states: (e) Definitions. In this section:
    (1) The term "emergency medical condition" means—
    (A) a medical condition manifesting itself by acute symptoms of sufficient severity
    (including severe pain) such that the absence of immediate medical attention could
    reasonably be expected to result in—
    (i) placing the health of the individual (or, with respect to a pregnant woman, the health of
    the woman or her unborn child) in serious jeopardy,
    (ii) serious impairment to bodily functions, or
    (iii) serious dysfunction of any bodily organ or part;

41. During the time that she was admitted to the hospital, (i) she was unable to speak for a
    week, (ii) She tested positive for Meningitis, Sepsis and developed extremely bad bed sores.

42. On or about July 3, 2020 at approximately 10:00 PM Danua Kumpin was transported by an
    ambulance to the Plaintiff's home.

43. On or about July 4, 2020 was taken by ambulance to Resurrection hospital due to her
    vegetative-like state. She was unable to speak. She received two blood transfusions.

## COUNT THREE: Violations of the First Amendment Rights and 42 U.S. Code § 1395dd (a) Refusal to consent to treatment (Against All Defendants)

44. Plaintiffs re-allege and incorporate the preceding paragraphs of this Complaint as if they
    were fully set forth herein.

45. 42 U.S. Code § 1395dd - Examination and treatment for emergency medical conditions
    and women in labor (EMTALA).

46. EMTALA states as follows:

47. EMTALA)(a) Medical screening requirement (2) Refusal to consent to treatment

48. A hospital is deemed to meet the requirement of paragraph (1)(A) with respect to an
    individual if the hospital offers the individual the further medical examination and

treatment described in that paragraph and informs the individual (or a person acting on the individual's behalf) of the risks and benefits to the individual of such examination and treatment, but the individual (or a person acting on the individual's behalf) refuses to consent to the examination and treatment. The hospital shall take all reasonable steps to secure the individual's (or person's) written informed consent to refuse such examination and treatment.

49. (3) Refusal to consent to transfer

50. A hospital is deemed to meet the requirement of paragraph (1) with respect to an individual if the hospital offers to transfer the individual to another medical facility in accordance with subsection (c) and informs the individual (or a person acting on the individual's behalf) of the risks and benefits to the individual of such transfer, but the individual (or a person acting on the individual's behalf) refuses to consent to the transfer. The hospital shall take all reasonable steps to secure the individual's (or person's) written informed consent to refuse such transfer.

51. The First Amendment's protection of free speech also protects freedom of thought.

52. By forcing individuals to take mind-altering drugs against their will, Defendants forcibly change the ability of such individuals to formulate particular thoughts. The involuntary administration of psychotropic drugs affects patients' mental processes, interfering with their freedom of thought.

53. On numbers occasions my mother Danuta Kimpin told me that she did not want to be at Regency, My mother said, "Come over with the police and take me out. I am hungry, I am cold, I am thirsty. They put a tray in the room and they leave the room. They do not feed me. Sooner or later I will forget how to talk."

54. My mother told me several times that she did not want to at Regency and asked why strangers were making decisions about her medical decisions about her body.

55. If a reasonable person were believe that Danuta Kumpin was not able to articulate that she was in severe pain when her thigh/femur bone was displaced. A displaced fracture means the pieces of bone moved so much that a gap formed around the fracture when the bone broke. A scale of 1-10 for pain most if not all people would report the pain as being as a 10.

56. If DANUTA KUMPIN was unable to articulate that she was in severe pain; Plaintiff on information believes that her inability to do so was caused by involuntary administration of drugs intravenously and by mouth that interfered with her freedom on though.

57. As a direct and proximate cause DANUTA KUMPIN was unable to articulate the fact the she was in severe pain and therefore, suffered unimaginable pain for an unknown amount of days because she was not given medication to treat the pain.

58. DANUTA KUMPIN was a survivor of the Nazi concentration camps in Germany. They did not even inflict such pain on her.

## COUNT FOUR (Medical Negligence- Against THE METHODIST MEDICAL CENTER FOUNDATION and the unregistered name of UNITY POINT TRINITY HOSPITAL

59. Plaintiffs re-allege and incorporate the preceding paragraphs of this Complaint as if they were fully set forth herein.

60. When a patient's name is the mix-up with another patient it exposes patients to an arbitrary opportunity for harm.

61. In the case at hand the deceased Danua Kumpin received medication, a treatment plan that was meant for a patient with a different medical history. Danua Kumpin did not have a history of dementia and received medications for a person with dementia.

62. As a direct and proximate cause Danua Kumpin developed an adverse drug reaction based on her current medical condition at the time.

63. The hospital failed to receive important medications and the treatment she came to the hospital for.

64. The hospital failed to take the standard and basis step by asking, the patient to verify her first and last name and her date of birth.

### COUNT FIVE: Violation of The Code of Federal Regulations (CFR) Title 42 - Public Health CHAPTER IV - CENTERS FOR MEDICARE & MEDICAID SERVICES, DEPARTMENT OF HEALTH AND HUMAN SERVICES SUBCHAPTER G - STANDARDS AND CERTIFICATION PART 483 -

**REQUIREMENTS FOR STATES AND LONG TERM CARE FACILITIES Subpart B - Requirements for Long Term Care Facilities § 483.25 Quality of care.**

## Against GENERATIONS AT REGENCY and its unknown owner or owners, REGENCY NURSING PROPERTY, LLC

65. Plaintiffs re-allege and incorporate the preceding paragraphs of this Complaint as if they were fully set forth herein.

66. The true names and capacities, whether individual, corporate, associate, or otherwise, of DOE Defendants 1 through 20 and ROE CORPORATIONS A through Z are unknown to Plaintiff, who therefore sues said Defendants by such fictitious names. Plaintiff is informed and believes and on that basis alleges, that each of the Defendants designated as DOE Defendants and ROE CORPORATIONS are responsible in some manner for the events and occurrences referenced in this Complaint, and/or owes money to Plaintiff and/ or may be affiliated with one of the other Defendants or may claim some interest in the subject matter of this Complaint. Plaintiff will ask leave of the Court to amend this Complaint and insert the true names and capacities of DOE Defendants 1 through 20 and ROE CORPORATIONS A through Z when the identities of the same have been ascertained and to join said Defendants in this action.

67. The acts performed by representatives of Defendants whether such representatives have been individually named herein as a defendant, or are yet to be identified, were all ones which those representatives had the actual and/or apparent authority to perform, may have been within the scope of their employment, were of the kind they were authorized to perform, and were actuated at least in part by a desire to serve their employers, and therefore the entity defendants are liable for their acts pursuant to the doctrine of respondent superior.

68. At all revenant times, the defendants, represented that physicians, residents, interns, nurses, radiologists, technicians and other medical personnel in its employ or on its staff were qualified and capable of rendering emergency, medical and health care and treatment and radiological, and surgical services in accordance with good and accepted standards of medical and hospital practice.

69. Plaintiff is informed and believe and thereon allege that at all times herein mentioned, each of the Defendants, including each of the Doe Defendants, was the agent, ostensible agent, servant, representative, associate, borrowed servant, and/or employee of each of the remaining Defendants, and was at all times herein mentioned acting within the course and scope of said agency, ostensible agency, and/or borrowed servant authority and employment and with the consent, permission and/or ratification of co-Defendants and each of them.

70. Upon information and belief, at all times stated below, the defendant(s), their agents, servants, partners, and/or employees, undertook to render care.

71. On or about, September 07, 2020, a complaint was filed with the Illinois Department of Public Health. The complaint numbers are as follows: IL126002-IL126617. On December 16, 2020. The Illinois Department of health and Human Services Centers for Medical & Medicaid Services found that GENERATIONS AT REGENCY and its unknown owner owners, REGENCY NURSING PROPERTY, LLC were in violations of:

A. The Code of Federal Regulations (CFR) Title 42 - Public Health CHAPTER IV - CENTERS FOR MEDICARE & MEDICAID SERVICES. DEPARTMENT OF HEALTH AND HUMAN SERVICES SUBCHAPTER G - STANDARDS AND CERTIFICATION PART 483 - REQUIREMENTS FOR STATES AND LONG TERM CARE FACILITIES Subpart B - Requirements for Long Term Care Facilities § 483.25 Quality of care.

B. § 483.25 Quality of care.

C. Quality of care is a fundamental principle that applies to all treatment and care provided to facility residents. Based on the comprehensive assessment of a resident. the facility must ensure that residents receive treatment and care in accordance with professional standards of practice, the comprehensive person-centered care plan, and the resident's choices, including but not limited to the following:

(d) Accidents. The facility must ensure that -

(1) The resident environment remains as free of accident hazards as is possible; and

(2) Each resident receives adequate supervision and assistance devices to prevent accidents.

Page 1 of 8 of EXHIBIT A of the report states as follows: This REQUIREMENT is not met as evidenced by:

Bases on observation, interviews and record reviews, the facility failed to ensure that Gail belts[1] are used during transfer, tailed to implement two person extensive assistance during transfer for a resident with Lift sided hemiplegia[2] and Hemiparesis[3] and failed to follow policy related to the indemnification of resident's individual risks and implementation of appropriate interventions in preventing falls and injury for four (R2[4], R3, R5 and R8) of five residents in the sample of 16 reviewed for falls, accidents and supervision.

Continue from page 1 Finding include:

1. R2 in an 84 year old, female, admitted in the facility on 07/09/2020 with diagnoses of Unspecified Dementia Without Behavioral Disturbance,[5] Muscle Weakness, generalized and unspecified Adnormatilies of Gait[6] and Mobility.

2. Hospital records dated 08/27/2020 indicated that R2 had Left hip Revision, Open Reduction Internal Fixation for periprosthetic fracture on left hip.

---

[1] A gait belt or transfer belt is a device put on a patient who has mobility issues, by a caregiver prior to that caregiver moving the patient. Patients may have problems with balance and a gait belt may be used to aid in the safe movement of a patient, from a standing position to a wheelchair, for example. The gait belt has been customarily made out of cotton webbing, with a durable metal buckle on one end. Cleanable vinyl gait belts were introduced due to the tendency of webbing to harbor supergerms.

[2] Paralysis affecting only one side of the body.

[3] Hemiparesis is weakness or the inability to move on one side of the body, making it hard to perform everyday activities like eating or dressing.

One-sided weakness in your arms, hands, face, chest, legs or feet can cause:
 Loss of balance, Difficulty walking, Impaired ability to grab objects, Decrease in movement precision,  Muscle fatigue, Lack of coordination, etc.

[4] The letter "R" stands for Resident.  R2 refers to Danua Kumpin, the deceased.

[5] **Without behavioral Disturbance** can mean that the patient is not showing the average signs of **dementia** yet.

[6] The manner or style of walking.

72. According to a report published on PubMed.gov, Periprosthetic femur fractures have a high rate of mortality.

*"Successful treatment of periprosthetic femur fractures, like all fractures, requires careful attention to understand the fracture pattern nuances, identifying and executing a rational treatment approach, and providing an appropriate postoperative recovery protocol. Unlike most other fractures, modification of standard techniques is often required to obtain a stable fixation construct, and there is a greater role for revision arthroplasty in the treatment of periprosthetic fractures….Both periprosthetic femoral shaft and distal femur fractures are associated with relatively **HIGH MORTALITY RATES**, approaching that of patients with hip fractures."* See *https://pubmed.ncbi.nlm.nih.gov/25699540/*

73. Progress Notes dated 08/25/2020 documented that V13 (Certified Nurse Assistant, CNA) reported that R2 was sitting on the floor mat next to her bed. R2 was asked on how fall occurred, stated she was reaching for something on the floor and fell. There were no pertinent findings found upon assessment at the time.

74. According to Progress notes DANUTA KUMPIN was found on 08/25/2020 "sitting on a floor mat." Displacement of the Femoral shaft are almost always caused by serious traumas like car accidents or falls from a high place. The facility was required to set the bed at the lowest level. Most if not all individuals would be in a tremendous pain when their thigh bone was broken.



75. The difference between a Displaced and non-displaced fracture.

A displaced fracture means the pieces of your bone moved so much that a gap formed around the fracture when your bone broke. Non-displaced fractures are still broken bones, but the pieces were not moved far enough to be out of alignment during the break. Displaced fractures are much more likely to require surgery to repair. Comminuted fractures are more likely to be displaced than other types of broken bones because they always have multiple broken pieces.

What causes comminuted fractures?

Comminuted fractures are caused by trauma. Some of the most common causes are car accidents and falls from a great height, like off a ladder or roof.

Any impact to your bones can cause a comminuted fracture. However, slips, falls and other common causes of broken bones are not usually strong enough damage to your bones enough to cause a comminuted fracture.

76. Incident Report dated 08/26/2020 recorded that R2 complained of pain in the left hip area. STAT (immediate) X-Ray to left hip and unilateral pelvis was ordered. Results came back indicating acute displaced fracture involving the L proximal of the femoral shaft displacing the femoral shaft component of the total hip replace laterally. She was sent to the hospital as ordered.

77. On 11/17/2020 at 2:28PM, V15 (Licensed Practical Nurse) was asked regarding R2's fall incident. He stated, "On 08/25/20, V13 told me that she (R2) was sitting on the floor mat next to her bed. I went to her room and assessed her. She was Calm, not screaming. Unable to elaborate what happened and was going on. My assumption was she wanted go to the bathroom and she fell on the floor mat. She has a behavior of going into the bathroom without call light assistance. She is confused. She is on the dementia floor."

78. V13 was also asked regard R3. She stated, "I just found her (R2) on the floor mat sitting. I called V15 and told him she (R2) was on the floor. She is a fall risk because she has a behavior of getting up from bed."

79. V3 (Director of Nursing) stated during an interview on 11/19/2020 at 10:56AM, "The case of her fracture as the fall because she has reaching something on the floor. She is alert, oriented, confused. But for the most part, she is alert and oriented and able to verbalize needs. In terms of interventions, we do education on her, personal belongings should be within reach. I couldn't prevent her from getting out of bed or from reaching something. So her call light should be within reach."

80. V5 (Restorative Director) was also interviewed regarding R2's fall incident. She stated, "I believe she attempted to self-transfer and ambulate on her own and fill in her room next to her bed, on the floor. Sometime she is confused but can be redirected. I am not aware of her behavior of getting up before fall incident. Continued from page 3.

81. She did not complain of anything but the next day. She complained of pain in her hi. She sustained fracture on the left femur. They did an assessment post fall and ROM (range of motion was fine but the X-Ray was done."

82. On 11/19/20 at 10:15 AM, V31 (Nurse Practitioner, NP) verbalized, "The case of her (R2) fracture was the fall she had. Interventions in preventing falls include the use of bed alarms; monitoring closely as often as staff can.

83. All staff has to monitor, her bed should be low, her room should be near nurses' station; and the use of floor mats. For confused residents like (R2), call light is oaky if she can use it but for Dementia, it's not applicable, depends on how she absorbs instructions."

84. Social Services Note dated 08/13/2022 documented that R2 scored 6 on her BIMS (Brief Interview for mental Status), which indicates she has severe cognitive impairment. R2's care plans of falls does not address any behavior risk factor due to cognitive level.

85. The remainder of Incident Report Investigation goes on to document the deficiencies under the Code of Federal Regulations (CFR) Title 42 - Public Health CHAPTER IV - CENTERS FOR MEDICARE & MEDICAID SERVICES.... § 483.25 Quality of care.

86. The Facility's policy titled, "Safe Lifting, movement and transfer of Residents" revised date 11/17 (Plaintiff is unable to determine if the revision took place on November of 2017 or was on November 17 or some unknown year). It described the policy that was in place before or after the incident occurred in which Danua Kumpin left thigh was broken.

87. The facility's policy entitled, "Fall Reduction Program" revised 04/19 (unclear date) describes in part the policy that was in place before or after Danua Kumpin's broken thigh occurred.

88. The Incident Report Investigation was electronically signed on DECEMBER **16**, 2020. Danua Kumpin died the following day on December **17**, 2020.

89. An acute fracture is a break in a bone that occurs quickly, rapidly and usually traumatically with lot of pain.|. Most is not all people would be screaming, crying or expressing some other emotion.

90. Per public medical information: If you have a comminuted fracture, you'll also likely experience serious symptoms of the trauma that caused it. Your symptoms will depend on the other injuries you have. But, in general, the symptoms of a comminuted fracture can include:

Intense pain.

Not being able to move a part of your body you normally can.

A part of your body is noticeably different looking or out of its usual place.

Seeing your bone through your skin.

Swelling. See

https://my.clevelandclinic.org/health/diseases/22252-comminuted-fracture

91. DANUTA KUMPIN must have experience some of these systems when her bones were broken. Therefore, she suffered excruciating pain from the time of fall. She would have definitely needed the assistance of at a minimum of two people to get back into bed. The report does not address the steps that were taken to get her back in bed or if they left her on the floor until 08/26/2020.It is significant to note that the Department of Health and Human services signed the report on12-16-2020 an Danua Kumpin died one day later on December 12, 2020.

## COUNT SIX - VIOLATION OF DANUTA KUMPIN'S FOURTEENTH AMENDMENT'S DUE PROCESS CLAUSE

92. Plaintiffs re-allege and incorporate the preceding paragraphs of this Complaint as if they were fully set forth herein.

### The Right of Patients to Refuse Medication

93. Two decades ago, recognizing that the right to refuse unwanted medical treatment has deep roots in the American justice system, the United States Supreme Court held that "[t]he forcible injection of medication into a non-consenting person's body represents a substantial interference with that person's liberty." Washington v. Harper, 494 U.S. 210, 229 (1990).

94. Today, the right of patients to refuse the involuntary administration of medication is firmly grounded in the United States Constitution, federal statutes, and the Illinois Constitution, statutes and regulations.

A. Federal Law Basis for the Right to Refuse Unwanted Medication

95. Over the last three decades, there has been an overwhelming trend across the United States, in both federal and state courts and legislatures, towards respecting the right of individuals to refuse unwanted medication and providing due process protections for the enforcement of this right.

96. The Supreme Court has observed that psychotropic drugs are "mind altering," Mills, 457 U.S. at 293 n.1, and "alter the chemical balance in a patient's brain, leading to changes . . . in his or her cognitive processes." Harper, 494 U.S. at 229. See also Scott v. Plante, 532 F.2d 939, 946 (3d Cir. 1976) ("It is sufficient to recognize that the involuntary administration of drugs which affect mental processes, if it occurred, could amount, under

an appropriate set of facts, to an interference with [a person's] rights under the first amendment.").

97. The Supreme Court held that the right to refuse medication is guaranteed by the Fourteenth Amendment's Due Process Clause.

98. Defendants' actions and omissions violate the rights of Plaintiff's constituents, guaranteed by the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

99. Such violations include, but are not limited to, the denial of constituents' rights to refuse non-emergency medication, to freedom from unwanted bodily intrusions, to due process in medication decisions, and to be treated by clinicians exercising professional judgment.

100. Defendants fail to comply with the regulations set forth in **42 U.S. Code § 1395dd**, by failing to notify patients of including but not limited to the following: A patient's right to refuse medication, the right to leave the facility if they chose to. The Defendant's polices violates contemporary standards of due process because:

(a) it allows the forcible medication of patients who are competent to make medical decisions;

(b) it allows the forcible medication of patients without a finding that the patients would pose a danger to themselves or others without medication;

(c) there is no legal representation provided to the patient;

(d) there is no truly independent psychiatric examination of patients who refuse medication;

(e) there is no notice provided to the patient;

(f) there is no right to confrontation;

(g) there is no decision by an impartial decision-maker who is independent of the hospital and Defendants' supervision;

(h) there is no limit to the length of time a patient can be forcibly medicated;

(i) there is no requirement limiting the type or dosage of medication with which a patient can be forcibly drugged;

(j) there is no meaningful review of involuntary medication decisions; and

(k) patients have no realistic means of appealing involuntary medication decisions.

101. In addition, Defendants have violated constituents' due process rights by failing to exercise professional judgment in their treatment of constituents, as evidenced by the Defendants' medication errors and psychiatrists' failure to consider utilizing less restrictive means of treatment and reasons why patients might refuse medication, including concerns regarding debilitating side effects.

102. As a direct and proximate result of the Defendant's actions Danuta Kumpin was harmed.

**COUNT SEVEN- (Negligent Hiring and Supervision- Against All Defendants)**

103. Plaintiffs re-allege and incorporate the preceding paragraphs of this Complaint as if they were fully set forth herein.

104. Defendants were each and all negligent in the hiring and/or supervision of physicians, nurses, agents, and others who failed monitor her closely.

105. As a proximate and direct cause of Defendants' negligence in hiring and supervision, DANUTA KUMPIN and Plaintiff have suffered catastrophic, continuing and terrible injuries and damages, as plead above.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against the Defendants, jointly and severally, for a sum of ONE MILLION DOLLARS ($1,000,000) as to Count one; for a sum of ONE MILLION DOLLARS ($1,000,000) as to count 2; for a sum of ONE MILLION DOLLARS ($1,000,000) as to count three; for a sum of ONE MILLION DOLLARS ($1,000,000) as to count four; for a sum of ONE MILLION DOLLARS ($4,000,000) as to count five, for a sum of ONE MILLION DOLLARS ($1,000,000) as to Count Six, for a sum of ONE MILLION DOLLARS ($1,000,000) as to Count Seven, **For punitive damage in the amount  in excess or the jurisdictional amount of this court,** together with costs and disbursements of this action; a trial by jury of all issues involved in this complaint; and such other and further relief as this Court may deem just and proper under the circumstances.

## JURY DEMAND

**A trial by jury is hereby demanded in this lawsuit**.

I declare under penalty of perjury this the facts contained in this lawsuit are correct.

_(signature)_
Alexander Kumpin

Executed on this 16th day of December 2022.

Alexander Kumpin
5401 N. Natoma, Chicago, IL 60656
773-931-7251

Civil Cover Sheet continued

Defendants:

REGENCY NURSING PROPERTY, LLC and its unknown owner or owners

SWEDISH COVENANT HEALTH

THE METHODIST MEDICAL CENTER FOUNDATION
UNITY POINT TRINITY HOSPITAL *and its*
*unknown owner or owners*
D/B/A - UNITY POINT HEALTH - CENTRAL ILLINOIS
FOUNDATION AND UNITYPOINT HEALTH METHODIST
/PROCTOR FOUNDATION
DOES 1-20, ROE CORPORATIONS A through Z, inclusive

KUMPIN